# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| KATHLEEN BETTS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 17 C 2709 |
| v. | ) | |
| | ) | |
| UNITED AIRLINES, | ) | Judge Thomas M. Durkin |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION & ORDER

Plaintiff Kathleen Betts sued defendant United Airlines under the Railway Labor Act, 45 U.S.C. § 153 (First) (q) seeking to vacate a System Board of Adjustment award that upheld her discharge from her job as a pilot with Continental Airlines (which later merged with United). Currently before the Court is United's motion for summary judgment [51]. For the reasons explained below, the Court grants United's motion.

## Background

Continental Airlines employed Betts as a pilot until her termination on April 16, 2008. R. 53 ¶ 4 (Betts's Response to United's L.R. 56.1 Statement of Facts). After Betts failed a "no notice" test for alcohol, Continental and Betts entered into a Last Chance Agreement ("Agreement") on March 12, 2008. *Id.* ¶ 5.

Paragraph 1 of the Agreement required Betts to complete a "course of rehabilitation . . . recommended by [the airline's Employment Assistance Program ('EAP')]." *Id.* ¶¶ 6-7. Paragraph 1 has four subsections, a through d. R. 51-2 at 41-

1

42. Paragraph 1a obligated Betts to execute an undated letter of resignation that could be used to terminate her if she "fail[ed] to satisfy any of the terms and conditions" of "the rehabilitation directed by EAP or the terms and conditions of this Agreement." R. 53 ¶¶ 6, 8. Paragraph 1b provided that as an "express condition for her continuing employment," "[f]or the remainder of her career with [the airline], any use of alcohol or illicit drugs will be considered a violation of this Agreement." *Id.* ¶ 9. Paragraph 1b further stated that "BETTS expressly agrees that her use of any non-prescription medication or other substance that contains alcohol . . . shall be considered a violation of this Agreement and shall result in the termination of BETTS' employment." R. 51-2 at 41. Paragraph 1c required Betts to maintain monthly contact with the EAP manager "[d]uring the rehabilitation/treatment period." *Id.* Paragraph 1d provided for "a return-to-work drug and alcohol test" on "release by EAP to return to work." *Id.* at 42.

Paragraph 2 of the Agreement provided that "BETTS shall be reinstated to a pilot position . . . upon satisfactory performance of her obligations under this Agreement." *Id.* Finally, paragraph 6 provided that Betts and her union "expressly agree that any violation of the terms outlined above will be considered a violation of the conditions of continued employment and that BETT's employment will be terminated as a result." R. 53 ¶ 10.

The same day Betts signed the Agreement, she also signed a Continental Airlines Authorization and Release ("Release") stating that she authorized the EAP "to use, disclose and exchange . . . health information" with staff of Betts's medical

care provider including "information related to Attendance, Assessment, Diagnosis, Recommendations, Treatment/Aftercare Plan, Progress Notes, Medical/ Psychiatric/ Psychological and Chemical Dependency Notes/ Documentation (including lab work)." *Id.* ¶ 11; R. 51-2 at 164. The parties dispute whether this authorization satisfied Health Insurance Portability and Accountability Act ("HIPAA") requirements and whether it authorized Betts's medical care provider to disclose Betts's treatment information to United. R. 56 ¶ 6 (United's Response to Betts's L.R. 56.1 Statement of Additional Facts).

On March 15, 2008, Betts was admitted to her medical care provider for treatment. R. 53 ¶ 12. While in treatment, on April 3, 2008, Betts signed a Continental Airlines EAP Statement of Confidentiality ("Confidentiality Statement") providing that information obtained from the EAP would be "held in confidence with . . . exceptions," including "(4) Management Referrals, SAP, and or Fitness-For Duty Evaluation – be advised information will be given to Management; (5) For co-ordination of on-going referral, communication will occur between the EAP staff and the managed mental health care company." *Id.* ¶ 13; R. 51-2 at 160. As with the Release, the parties dispute whether this Confidentiality Statement satisfied HIPPA or authorized the medical care provider to disclose Betts's treatment information to United. R. 56 ¶ 5.

Betts continued treatment at the medical care provider until April 11, 2008, when she left on a pass to go home. R. 53 ¶ 14. Betts returned to the medical care provider late on April 15, 2008, and a breath analysis tested positive for alcohol. *Id.*

¶ 15. The medical care provider told Betts that the EAP had been contacted and that "drinking would change her options." *Id.* ¶ 16. On a conference call with the EAP and the medical care provider, Betts "admitted and informed the EAP and chief pilot of her situation," and "owned up to drinking three glasses of wine on Sunday, Monday and Tuesday morning before her return to the [medical care provider]." *Id.* ¶ 17.

Betts failed to attend a meeting scheduled for April 16, 2008 with Continental to discuss treatment options. *Id.* ¶ 19. That day, Continental terminated Betts for violating the Last Chance Agreement. *Id.* ¶ 20. Betts requested an appeal of the termination decision on May 2, 2008. *Id.* ¶ 22. Betts's grievance was not resolved prior to Continental's merger with United in 2010. *Id.* ¶ 23.

A collective bargaining agreement between Betts's union and United provided for arbitration of Betts's grievance. *Id.* ¶ 26. The union declined to prosecute Betts's grievance on her behalf. *Id.* ¶ 27. Betts therefore proceeded *pro se* at a July 2016 arbitration hearing before a three-member System Board of Adjustment ("Board"). *Id.* ¶¶ 27-28. The Board denied Betts's grievance in October 2016, finding that the airline had just cause to terminate Betts after she failed the breathalyzer test in April 2008. *Id.* ¶ 29. The Board's award states:

> a majority of the Board finds that [Betts] violated the [Agreement] when she tested positive for alcohol within one month of signing the [Agreement] and while still participating in the in-patient treatment program at [the medical care provider], even if she was awaiting admission to a halfway house. Thus, [Betts's] termination was pursuant to paragraphs 1 and 1a of the [Agreement], as quoted above.

*Id.* ¶ 30. The Board explained that the Last Chance Agreement forbid Betts "from using *any* alcohol, for the duration of her employment," and that the airline "received a business record from [the medical care provider], i.e., a report of a drug screen and breathalyzer test of [Betts], and the [airline] reasonably relied thereon."

*Id.* ¶ 31. The Board explained that its finding would not

> change even if [Betts] was, as she alleges, in the process of transitioning from an in-patient treatment program at the [medical care provider] to a halfway house. The entirety of the in-patient treatment plan, any transition to a halfway house and any after care prescribed for [Betts] are all under the auspices of the EAP and, therefore, covered by the [Last Chance Agreement].

*Id.* ¶ 32.

Betts sued the Airline Pilots Association in April 2017. R. 1. After this Court appointed counsel, Betts filed an amended complaint dismissing the Airline Pilots Association and naming United instead. R. 45. The amended complaint makes two claims: (1) Count I alleging that the Board award fails to "draw its essence" from Betts's Last Chance Agreement; and (2) Count II alleging that the Board award violates public policy. R. 45. In January 2018, United moved for summary judgment on both counts. R. 51.

## Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light

most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Analysis

This case arises under the Railway Labor Act, 45 U.S.C. § 153 First (q), "which establishes a framework for the efficient resolution of labor disputes within the transportation sector." *Pokuta v. Trans World Airlines, Inc.*, 191 F.3d 834, 839 (7th Cir. 1999). "In keeping with the purpose of that framework, and with the statute itself, which permits federal courts to intervene only in limited circumstances, judicial review of a board of arbitrators' decision is 'among the narrowest known to law.'" *Id.* (quoting *Union Pacific R.R. Co. v. Sheehan*, 439 U.S. 89, 91 (1978)).

"Generally speaking, a federal court has jurisdiction to review the Board's decision only when it is asserted that (1) the Board failed to comply with the requirements of the Railway Labor Act; (2) the Board failed to confine itself to matters within its own jurisdiction; or (3) the Board or one of its members engaged in fraud or corruption." *Id.* (citing *Sheehan*, 439 U.S. at 91). Count I—which argues that the Board's decision failed to "draw its essence" from the Last Chance

6

Agreement—falls within the second category. *E.g., Office & Prof'l Employees Int'l Union Local 109 v. Air Methods Corp.*, 2010 WL 3700024, at \*5 (E.D. Wis. Sept. 14, 2010). Count II—alleging a violation of public policy—does not fall within any of the three categories. But Betts urges this Court to join a number of courts of appeals in holding that in addition to the three categories, RLA arbitration awards are subject to public policy review. *E.g., Union Pacific R.R. Co. v. United Transp. Union,* 3 F.3d 255, 259-60 (8th Cir. 1993).

## I.     Count I: Award Drawing Essence From Last Chance Agreement

"The Board's jurisdiction 'is limited exclusively to the interpretation or application of existing agreements': therefore, the [challenged] decision must get its essence from the [Last Chance Agreement]." *Office & Prof'l Employees*, 2010 WL 3700024, at \*5 (quoting *Wilson v. Chicago & N. W. Transp. Co.*, 728 F.2d 963, 967 (7th Cir. 1984)). Betts maintains in Count I that the Board's award did not "draw its essence" from the Last Chance Agreement because the Agreement prohibited alcohol consumption only during the remainder of Betts's "career," and the Board affirmed termination of Betts for alcohol consumption outside of her "career." R. 54 at 3-6. Betts relies on Paragraph 1b of the Agreement, which provided as an "express condition for her continuing employment" that "[f]or the remainder of her career with [the airline], any use of alcohol or illicit drugs will be considered a violation of this Agreement." R. 53 ¶ 9. Betts argues that because the Agreement provides for a "treatment period" followed by "release by EAP to return to work" and "reinstate[ment] to a pilot position," the treatment period was not part of Betts's

7

"career." R. 54 at 4-5. Betts therefore argues that consuming alcohol during the treatment period did not violate the Agreement.

Betts's argument fails at the outset because it asks the Court to decide whether the Board properly interpreted the Agreement. *See* R. 54 at 1 (Betts argues that the Board "made an untenable interpretation" of the Agreement). The sole question for the Court is whether the Board interpreted the Agreement at all or disregarded it. *See, e.g.*, *Lyons v. Norfolk & W. Ry. Co.*, 163 F.3d 466, 469 (7th Cir. 1999) (a party can complain if "the arbitrators don't interpret the contract" or "disregard the contract"). Whether the Board misinterpreted the Agreement is not within the scope of this Court's review. The Seventh Circuit spelled this out in no uncertain terms in *Lyons*:

> [A]s we have said too many times to want to repeat again, the question for a federal court asked to set aside an arbitration award . . . is not whether the arbitrator erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract. If they did, their interpretation is conclusive.

*Id.* at 470.

There is no question in this case that the Board interpreted the Agreement. The Board specifically found a violation of "paragraphs 1 and 1a" of the Agreement, including the provision in paragraph 1 forbidding Betts "from using *any* alcohol, for the duration of her employment." R. 53 ¶¶ 30-31.[1] Not only that, but the Board

---

[1]    The Board mentioned paragraphs 1 and 1a, and not 1b specifically. But paragraph 1b is part of paragraph 1, and the Board referred directly to paragraph 1b's provisions prohibiting alcohol use.

expressly addressed and rejected Betts's argument that her consumption should not count because it occurred during her treatment period, explaining that "[t]he entirety of the in-patient treatment plan, any transition to a halfway house and any after care prescribed" are all "under the auspices of the EAP, and therefore, covered by the [Last Chance Agreement]." *Id.* ¶ 32; *see also* R. 54 at 4 (Betts acknowledges that the Board "facially engaged with the language of the 'remainder of her career' clause"). The fact that the Board interpreted the Agreement ends the inquiry. It is not for this Court to say whether the Board's interpretation was correct. *See, e.g.*, *Lyons*, 163 F.3d at 470 (where Board found that it was not unjust for employer to fire plaintiff for failing to provide a urine sample when ordered to do so, the Board "was interpreting the contractual term 'unjust,'" and because the Board "interpreted the contract, its interpretation is conclusive").

Nor is this a case, as Betts claims, where the Board did not "*say* [its] award is noncontractual," but there is no "possible interpretive route to the award." *See Chicago Typographical Union No. 16 v. Chicago Sun-Times, Inc.*, 935 F.2d 1501, 1506 (7th Cir. 1991) (holding that even where interpretive route is not spelled out or there is an "error in interpretation," the award stands as long as there is a "possible interpretive route to the award"). The Board found Betts's treatment period to be "under the auspices of the EAP." R. 53 ¶ 32. This conclusion is supported by Paragraph 1's prefatory language, which provides for "rehabilitation/treatment . . . directed and facilitated by EAP" and a "course of rehabilitation . . . recommended by the EAP," followed by subparagraphs a through d laying out specific terms of that

9

course of rehabilitation. R. 51-2 at 41 (¶ 1). The Board found that Betts failed to satisfy the EAP requirements when she violated the provisions in ¶ 1b proscribing use of alcohol (which, notably, contains no carveout for the treatment period). *Id.* (¶ 1b) (no alcohol "[f]or the remainder of [Betts's] career"); *see also id.* ("BETTS expressly agrees that her use of . . . alcohol . . . shall be considered a violation of this Agreement and will result in termination of BETTS's employment."); *id.* at 43 (¶ 1a) (failure to satisfy any terms and conditions of "the rehabilitation directed by EAP" will result in termination). Paragraph 1b makes lack of alcohol use "[f]or the remainder of her career" an "express condition of [Betts's] *continuing* employment" (*id.* (¶ 1b) (emphasis added)), which further supports the interpretation that Betts's "career" persisted during her treatment period. Indeed, Betts's employment with the airline did not end until *after* her violation of the Last Chance Agreement. R. 53 ¶ 4. There was no "willful disregard of the contract" here, *Chicago Typographical*, 935 F.2d at 1506—far from it. The Court therefore grants United's motion for summary judgment on Count I.

## II.     Count II: Public Policy

United argues as a threshold matter that the RLA does not allow for public policy review of arbitration awards. The Supreme Court denied a petition for writ of certiorari to address this issue in 2014. *Air Methods Corp. v. Office & Prof'l Employees Int'l Union*, 134 S. Ct. 2295 (2014). United relies on older district court cases finding no public policy review permitted under the RLA (including a case in this district), all of which emphasize the strictness of the Supreme Court's language

delineating the three categories of review in *Sheehan*. *See Bhd. of R.R. Signalmen v. Union Pac. R.R. Co.*, 1997 WL 80956, at *2 (N.D. Ill. Feb. 21, 1997); *Denver & Rio Grande W. Ry. Co.,* 963 F. Supp. 946, 948-49 (D. Colo. 1997); *NetJets Aviation, Inc. v. Int'l Bhd. of Teamsters,* 2006 WL 1580216, *6 (S.D. Ohio June 2, 2006). But these district court decisions have not been adopted by the courts of appeals that have addressed the issue, which instead have either found public policy review available or declined to decide the issue. *See, e.g.*, *United Transp. Union,* 3 F.3d at 258 (public policy review available under the RLA); *Delta Air Lines, Inc. v. Air Line Pilots Ass'n,* 861 F.2d 665, 674 (11th Cir. 1988) (same); *Nat'l R.R. Passenger Corp. v. Fraternal Order of Police, Lodge 189 Labor Comm.*, 855 F.3d 335, 338 (D.C. Cir. 2017), *cert. denied*, 138 S. Ct. 979 (2018) (same); *Air Methods Corp. v. OPEIU*, 737 F.3d 660, 669 (10th Cir. 2013) ("we do not need to decide this issue because we hold that the arbitrator's award in this case did not violate public policy"); *NetJets Aviation, Inc. v. Int'l Bhd. of Teamsters, Airline Div.*, 486 F.3d 935, 939 (6th Cir. 2007) ("assuming" without deciding "that public policy review is permitted under the RLA").

The Seventh Circuit has not decided whether public policy review is available for Board awards under the RLA. But at least one court in this district has found such review available based on the Seventh Circuit's decision in *Chrysler Motors Corp. v. Int'l Union, Allied Indus. Workers of Am., AFL-CIO*, 959 F.2d 685, 687 (7th Cir. 1992), and the Supreme Court's decision in *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber,* 461 U.S. 757, 766 (1983), reviewing arbitrators'

11

interpretations of collective bargaining agreements outside the RLA-context for violations of public policy. *See Held v. Am. Airlines, Inc.*, 2007 WL 433107, at *7 (N.D. Ill. Jan. 31, 2007).

Although it appears likely the Seventh Circuit would recognize public policy review of an award by the Board under the RLA, this Court finds it unnecessary to decide the issue. Even assuming authority to do so, the Court would not vacate the arbitration award here on public policy grounds. "For an arbitration award to violate public policy, the policy involved must be an explicit public policy that is well defined and dominant, and is . . . ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest." *Air Methods*, 737 F.3d at 669; *accord Chrysler*, 959 F.2d at 687. The public policy rationale for refusing to enforce an arbitration award is "a limited exception" in which the Court "ask[s] only whether the award itself . . . , and not the underlying reasons for the award, violate[s] public policy." *Air Methods*, 737 F.3d at 669.

Courts have vacated arbitration awards under the RLA on public policy grounds to correct situations that are the exact opposite of this case—*i.e.*, where a pilot or a train operator was *reinstated* despite using drugs or alcohol instead of *terminated* for using drugs or alcohol. In *United Transp. Union*, for example, the Eighth Circuit found that an award reinstating a train brakeman despite evidence indicating that he caused a train accident while using alcohol and drugs violated "a well-defined and dominant public policy against a railroad's employment of individuals whose impaired judgment due to the use of drugs or alcohol could

serious threaten public safety." 3 F.3d at 261-62. The Eleventh Circuit in *Delta Air Lines* held similarly in the context of a pilot who "flew an airplane while drunk" and was reinstated. 861 F.2d at 674. Betts cites no case vacating an award on public policy grounds in circumstances like hers.

Betts nevertheless claims that it would violate public policy for this Court to enforce the Board's award because it "was based on evidence gained in violation of public policy." R. 54 at 1. Specifically, Betts argues that her breathalyzer test results never should have been disclosed by the provider to the airline. *Id.* at 2.

The Court rejects this argument for two reasons. *First*, Betts's argument does not concern the "award itself." *Air Methods*, 737 F.3d at 669. Betts's argument instead focuses on the underlying process pursuant to which the EAP gained its evidence. "In considering whether to refuse to enforce an arbitration award based on public policy, the question for the court is not whether any underlying actions by the parties violated public policy, but whether the specific actions ordered by the award do so." *Bhd. of Locomotive Engineers & Trainmen v. Union Pac. R. Co.*, 882 F. Supp. 2d 1032, 1040 (N.D. Ill. 2012), *aff'd sub nom. Bhd. of Locomotive Engineers & Trainmen, Gen. Comm. of Adjustment, Cent. Conference v. Union Pac. R. Co.*, 719 F.3d 801 (7th Cir. 2013). Because Betts's argument is not about a violation of public policy in the specific actions ordered by the Board, but instead concerns "underlying actions by the parties," it necessarily fails. *See id.*

*Second*, even looking beyond the award itself to the parties' underlying actions, Betts's argument still fails. Betts cites the patient-psychotherapist privilege

recognized in Fed. R. Evid. 501 and case law interpreting it, which recognize the policy import of confidentiality when persons are treated for addictions including alcoholism. R. 54 at 8-9. The problem with this argument is that Betts affirmatively waived confidentiality when she voluntarily signed the Release and again when she signed the Confidentiality Statement with its exception for communications between the medical care provider and the EAP. Betts also willingly signed the Last Chance Agreement requiring her to complete the course of rehabilitation recommended by the EAP, including refraining from using alcohol. As United points out, communication had to occur between the medical care provider and the EAP in order for the EAP to ensure compliance with the course of rehabilitation.

Betts interprets the Release and Confidentiality Statement as a one-way street, allowing the EAP and the airline to give information to the provider but not vice versa. This argument is contrary to the plain language of these documents. The Release authorized an "exchange" of information between the provider and the EAP, including related to "Assessment, Diagnosis . . . Medical/Psychiatric/Psychlogical and Chemical Dependency Notes/Documentation (including lab work)." R. 51-2 at 164. The Statement likewise made clear that "communication will occur between the EAP staff and the managed mental health care company." R. 51-2 at 160. And this makes good sense. The whole point of a last chance agreement is to know if an employee forfeits her last chance. If a release corresponding with a last chance agreement permitted one-way communication only, there would be no way for the employer learn about a violation from a medical service provider.

14

Betts also argues that the Release does not comply with HIPAA because it contains no expiration date, and that the Confidentiality Statement does not comport with HIPAA requirements to use plain language for waivers. This is not an objection Betts raised below, and it was not a subject of the Board's review. The Court declines to delve into the weeds of reviewing the Release and Confidentiality Statement for HIPAA compliance when Betts has not identified an "explicit public policy" that the Board's award itself violates. *See Air Methods*, 737 F.3d at 669; *see also United Transp. Union*, 3 F.3d at 261 (when determining whether award violates "an explicit public policy," the Court must "carefully observ[e] the [RLA's] proscription against judicial factfinding").

Additionally, separate and apart from the information provided from the provider pursuant to the Release and Confidentiality Statement that Betts says do not comply with HIPAA, Betts *admitted* to drinking alcohol on a conference call with the EAP. R. 53 ¶ 17. Betts takes issue with this fact being part of the administrative record, saying that but for the information provided by the provider to the airline about her breathalyzer result, Betts never would have made this admission. This speculation, even if true, does not show that Betts's admission was not properly made part of the administrative record.

In sum, there is no public policy basis for vacating the Board's award. The Court grants United's motion for summary judgment on Count II.

## Conclusion

For the foregoing reasons, the Court grants United's motion for summary judgment [51].

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated: September 28, 2018